The CITY OF VIRGINIA BEACH, VIRGINIA; Thomas M. Leahy, III, Plaintiffs–Appellees,

v.

UNITED STATES DEPARTMENT OF COMMERCE, Defendant–Appellant.

No. 93–1038.

United States Court of Appeals, Fourth Circuit.

Argued April 1, 1993.

Decided June 9, 1993.

Steve Frank, Civ. Div., U.S. Dept. of Justice, Washington, DC (Stuart M. Gerson,

Asst. Atty. Gen., Richard Cullen, U.S. Atty., Leonard Schaitman, on brief), for appellant.

George A. Somerville, Mays & Valentine, Richmond, VA (John F. Kay, Jr., M. Scott Hart, Susan Warriner Custer, Richmond, VA, Leslie L. Lilley, City Atty., William M. Macali, Asst. City Atty., City of Virginia Beach, Virginia Beach, VA, on brief), for appellees.

Before PHILLIPS, HAMILTON, and LUTTIG, Circuit Judges.

## OPINION

PHILLIPS, Circuit Judge:

In this case, we consider the scope of the deliberative process privilege incorporated into Exemption 5 of the Freedom of Information Act ("FOIA"), 5 U.S.C.A. § 552 (1988 & Supp.1993). The United States Department of Commerce ("the government") appeals an order of summary judgment requiring its branch agency, the National Marine Fisheries Service ("NMFS"), to release certain documents withheld from the City of Virginia Beach, Virginia and City Engineer Thomas M. Leahy III (collectively, "the City"). *Virginia Beach v. United States Dep't of Commerce*, 805 F.Supp. 1323 (E.D.Va.1992). We affirm in part, reverse in part, and remand.

## I

The Roanoke River flows from the mountains of Virginia southeast to the coast, emptying into the Albemarle Sound in northeastern North Carolina. The river is dammed in several places to control flooding and to generate hydroelectric power. Virginia Electric and Power Company ("VEPCO") operates such a dam and the resulting reservoir, called Lake Gaston, under license from the Federal Energy Regulatory Commission ("FERC"). J.A. 38.

In the late 1970s, facing increasingly serious water shortages, the City sought permission from the United States Corps of Engineers ("the Corps") to build a pipeline to withdraw up to 60 million gallons of water per day from Lake Gaston. During the permit proceedings, NMFS expressed concern about the project's possible impact on the reproductive success of an already declining striped bass population. In 1983, however, NMFS concurred with the Corps' finding that the project would have no significant environmental impact ("FONSI") and with the correlative conclusion that no environmental impact statement ("EIS") was necessary. J.A. 147. In 1984, the Corps granted the City its construction permit.

The State of North Carolina and other interested parties challenged that decision under the Administrative Procedure Act, 5 U.S.C. § 706 (1977). The district court for the Eastern District of North Carolina affirmed in part but remanded for reconsideration of the need for an EIS or mitigative measures, and for reassessment of the City's water needs. *North Carolina v. Hudson,* 665 F.Supp. 428 (E.D.N.C.1987). After that remand, NMFS reassigned review authority for the project from its Northeastern Region to its Southeastern Region, whose personnel—particularly those based in North Carolina—included experts on Roanoke Basin fishery resources. Relations between the City and NMFS deteriorated markedly thereafter.

For example, during the remand the City conducted a seminar on its proposal to mitigate the project's effects on downstream fishery resources. The plan was to divert stored waters to offset reduced flow at key points in the striped bass spawning cycle. NMFS attended the seminar and, the City contends, subsequently forwarded the mitigation plan to other agencies, where it was favorably reviewed. J.A. 134–35. Nevertheless, in 1988 NMFS recommended to the Corps that the City should prepare an EIS after conducting "a full environmental impact study." *North Carolina v. Hudson,* 731 F.Supp. 1261, 1270 (E.D.N.C.1990), *aff'd,* 940 F.2d 58 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1992). NMFS did not account for the City's mitigation proposal in taking that position, *Hudson,* 731 F.Supp. at 1270 n. 10, and upon inquiries from U.S. Congressman Walter Jones (D–N.C.), represented that it had not seen the mitigation proposal. J.A. 165. NMFS later admitted that representation to be incorrect.

J.A. 208. The incident sparked frustration and concern among City personnel. J.A. 18.

At the conclusion of the proceedings on remand, the Corps confirmed its prior assessment that the project would have no significant environmental impact and rejected NMFS' recommendation that an EIS be required. As a precautionary measure, however, the Corps conditioned its permission to construct the pipeline on the City's implementation of mitigation procedures. That decision was upheld on judicial review. *Hudson*, 731 F.Supp. at 1273.

With the construction permit in hand, the City needed easements from VEPCO to build the pipeline. VEPCO could not grant the easements without permission from FERC. FERC, in turn, is required by statute to solicit NMFS' comments upon such proceedings in order to conserve and promote fishery resources. 16 U.S.C. §§ 803(j)(1), 811, 662(a)–(b). On July 23, 1990, VEPCO independently solicited NMFS comments on issues raised by the easement proceedings, intending to incorporate NMFS' input into its application process. J.A. 34.

On July 30, the City also wrote to NMFS Director William W. Fox, Jr., raising a number of concerns regarding the agency's position on the pipeline. First, the City asked five specific questions, which focused primarily on the justifications for (1) NMFS' failure to approve the City's mitigation plan; (2) its conclusion that the pipeline required an EIS; and (3) its decision to shift project review responsibility to its Southeastern Region. In lengthy appendices to the July letter, the City also raised several allegations that key personnel in the Southeastern Region were infecting the review process with their bias against the project.[1] J.A. 141–206; S.A. 18–19.

Concerned by the "strong nature of the allegations," Fox sought an "independent review of the facts." S.A. 7. Consequently, he turned to the General Counsel's office of NMFS' parent agency, the National Oceanic and Atmospheric Administration ("NOAA"). (At the time, Fox was also NOAA's Assistant Administrator of Fisheries. J.A. 94.) An investigation was conducted by Kevin Collins, a novice attorney with the General Counsel-Fisheries Division. Collins submitted the results of his study, since denominated "the Collins Report," to a member of Fox's staff. *Id.* The Southeastern Region, however, did not receive the Collins Report until August 31—the day after it had responded to VEPCO's request for comments on the upcoming FERC proceedings. J.A. 42; S.A. 7.

On September 11, 1990, Fox sent an "interim response" to the City's July letter, stating that the agency was preparing replies to the five specific questions and that, with respect to the "allegations regarding NMFS' handling of [the pipeline] project, ... [the agency had] conducted an independent analysis of this matter." J.A. 207. In October, the City again wrote to NMFS, seeking justification for the comments that the agency had submitted to VEPCO in anticipation of the FERC proceedings. Although the City's July letter ostensibly had focused on NMFS' shifting stance during the completed Corps permit proceedings, while the October letter focused on the agency's comments regarding the pending FERC proceedings, the issues raised in the letters overlapped significantly.[2]

---

1. Specifically, the City charged that (1) NMFS had cited nonexistent "new evidence" to justify its change in position on the need for an EIS; (2) NMFS had falsely stated that it had no chance to review the City's mitigation plan; (3) personnel in NMFS' Southeastern Region sought to block the pipeline on behalf of the State of North Carolina and Congressman Jones; and (4) NMFS scientist Charles Manooch had misused his position to further his own interests and those of the North Carolina Wildlife Federation (of which he was president during the relevant time period, and which had filed an *amicus* brief in opposition to the project). *Virginia Beach*, 805 F.Supp. at 1332; S.A. 18–19.

2. As noted above, the July letter questioned, in relatively general terms, (1) NMFS' failure to approve the City's proposed mitigation plan, and (2) NMFS' shift from its 1983 position that the project—without mitigation—would have minimal environmental impact, to its 1988 position that the project—with mitigation—would have significant environmental impact. J.A. 19. The October letter challenged NMFS' more specific comments to VEPCO that: (1) low water flow caused low striped bass spawning rates; (2) the project could significantly affect existing hydropower operations, hardwood bottomlands, and temperature and oxygen levels in Albemarle Sound; (3) the City should remodel its working flow regime; and (4) other pending projects

In November 1990, Fox responded to the City's July and October letters in a single missive. J.A. 29–30. He addressed two of the five specific questions raised in the July letter and, through an appendix, several of the specific questions raised in the October letter. He did not discuss the allegations of impropriety, mentioning neither the existence of the Collins Report nor the firestorm it ignited in the Southeastern Region.[3] Nor did Fox explain the agency's failure to approve the City's mitigation proposal, construing that issue as mooted by the judicial approval of the Corps' final decision to grant the construction permit. *Id.*

█ Unsatisfied with Fox's response, the City filed a FOIA request in December 1990[4] for sixteen enumerated categories of documents along with any others "related in any way to the Lake Gaston project." J.A. 16. NMFS released some of the documents, but withheld others under FOIA's Exemption 5, which shields "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 covers attorney work-product, *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 864 (D.C.Cir.1980), along with documents "that would routinely be shielded from discovery in private litigation because of the government's 'executive privilege', which protects the 'deliberative or policymaking pro-

cesses' of government agencies." *Access Reports v. Department of Justice*, 926 F.2d 1192, 1194 (D.C.Cir.1991) (citations omitted).

After exhausting its administrative appeals, the City filed the instant action to obtain the withheld documents. The government moved for summary judgment. The Magistrate Judge recommended granting the motion. After the City filed a supplemental memorandum and affidavit, the district court remanded for reconsideration of the newly submitted materials and for *in camera* review of the withheld documents. The Magistrate Judge then recommended that seven documents be released in full or in part, but that the remaining items be protected by Exemption 5 either as work product or as reflecting the agency's deliberative process.[5] J.A. 259–63, 265, 275–76.

Both parties filed objections to the Magistrate Judge's recommendation. With respect to the documents categorized as exempt work product, after *in camera* review the district court accepted the recommendation as to all but Document 71, which the court recategorized as exempt under the deliberative process privilege.[6] 805 F.Supp. at 1328 & n. 8. The court then divided the remaining documents into three categories, comprising draft and final documents addressing the five questions raised in the City's July 30 letter (Category A);[7] the Collins Report and related documents (Category B);[8] and mis-

---

would exacerbate the pipeline's effects. J.A. 24–27.

3. The Southeastern Region's response to the Collins Report led one administrator to comment, "In retrospect, our decision to use a Kevin Collins type for the review was a good one to prevent a compromises and/or [sic] bias by programmatic people. Too bad it still ended up in the program's lap." S.A. 17.

4. The City had filed previous FOIA requests in October 1988 and January and November 1990. J.A. 16.

5. In its Vaughn index, NMFS described a total of 76 documents as responsive to the City's requests and offered justifications for exempting 66 of them in full or in part. J.A. 88–128; *see Vaughn v. Rosen*, 523 F.2d 1136 (D.C.Cir.1975). Docu-

ments "A" and "B", both products of USFWS, were added later.

At the time of the Magistrate Judge's final report, NMFS had released Documents 51, 56, and 75. Recommended for full or partial release were Documents 13, 28, 32, 69, 73, 76 and "A". Recommended exempt as work product were Documents 2, 3, 4, 6, 18, 71, and "B". Disregarding duplicative documents, the rest were recommended to be exempted under the deliberative process privilege.

6. Thus, on the record before this court, Documents 2, 3, 4, 6 and 18 have been ruled exempt work product. 805 F.Supp. at 1328 & n. 8.

7. Documents 8, 12, 13, 14, 17, 19, 21, 23–25, 28, 29, 33, 35–37, 39, 42–46, 49, 50, 52, 53, 59, 60, 61, 64–70, 73, and 74.

8. Documents 10, 11, 30, 32, 41, 54, and 55.

cellaneous other documents (Category C).[9] *Id.* at 1329–30 & nn. 10–12. The court rejected the Magistrate Judge's recommendation that these documents be held exempt under the deliberative process privilege of Exemption 5, except for Document 71 and fragments of Document 65, which, the court concluded, related in part "to the pending FERC proceedings, and [were] therefore pre-decisional and deliberative." *Id.* at 1331 n. 14.

The government filed motions for reconsideration and for a stay pending reconsideration or appeal. Fed.R.Civ.P. 59(e), 62. After a hearing, the court denied the former motion,[10] but granted the latter. On appeal, the government has stated its intention to release the Category C documents, but seeks to continue withholding thirty documents from categories A and B.[11] The City has filed no cross-appeal.

## II

■ "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 2326, 57 L.Ed.2d 159 (1978). Given the statute's presumption for disclosure, its enumerated exemptions are to be construed narrowly, *United States Dep't of Justice v. Julian*, 486 U.S. 1, 8, 108 S.Ct. 1606, 1610, 100 L.Ed.2d 1 (1988), and the burden of justifying nondisclosure rests squarely upon the government. 5 U.S.C. § 552(a)(4)(B). Viewing "the evidence presented through the prism of [that] substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), we must determine *de novo* whether, after taking all the evidence in a light most favorable to the nonmovant City, there remains no genuine issue of material fact and the government is entitled to judgment as a matter of law.[12] *Pulliam Invest. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

■ On appeal, the government seeks to withhold the remaining thirty documents solely under the deliberative process privilege afforded by Exemption 5. This privilege is designed to protect the quality of administrative decisionmaking by ensuring that it is not done "in a fishbowl." *Environmental Protection Agency v. Mink*, 410 U.S. 73, 87, 93 S.Ct. 827, 835, 35 L.Ed.2d 119 (1973) (citing S.Rep.No. 813, 89th Cong., 1st Sess. 9 (1965)). Thus, the privilege encourages free-ranging discussion of alternatives; prevents public confusion that might result from the premature release of such nonbind-

---

9. Documents 1, 5, 7, 47, 75, and 76.

10. With its Rule 59(e) motion, the government submitted supplemental affidavits by Fox and Collins. The parties disagree over whether these documents are properly preserved in the record. It appears from the transcript of the oral argument on the motion for rehearing that the district court considered the affidavits carefully before finding them to be untimely, redundant and, in significant part, not credible. J.A. 384.

 The government has not put the denial of its motion for rehearing formally at issue before this court. Indeed, it openly concedes the affidavits' redundancy, satisfied that "the record, absent the declarations, can stand on its own." Reply Br. 11. Therefore, we decide this case on the record before the district court at the summary judgment hearing.

11. The withheld documents are Nos. 10, 11, 17, 19, 21 (page 2), 25 (¶ 2 on page 2) and its duplicate 27; 30, 33, 35–37, 39, 41–44, 46, 53–55, 58, 60–62, 67, 68, 70, 73 (last line) and document "A". Government Br. 12 nn. 7–8.

12. By conducting *in camera* review, the district court established an adequate factual basis for its decision. *See Bowers v. United States Dep't of Justice*, 930 F.2d 350, 353 (4th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 308, 116 L.Ed.2d 250 (1991). The second step in conducting a FOIA review is to determine whether, upon that factual basis, the decision was clearly erroneous. *Id.* As *Bowers* made clear, however, the question whether a document fits within one of FOIA's prescribed exemptions is one of law, upon which the district court is entitled to no deference. *Id.; accord Petroleum Information Corp. v. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C.Cir.1992); *Spannaus v. United States Dep't of Justice*, 813 F.2d 1285, 1288 n. 4 (4th Cir.1987); *but see Assembly of California v. United States Dep't of Commerce*, 968 F.2d 916, 919 (9th Cir.1992) (determination whether disclosure would reveal agency's deliberative process "is a fact-based inquiry where deference to the district court's findings is appropriate.").

ing deliberations; and insulates against the chilling effect likely were officials to be judged not on the basis of their final decisions, but "for matters they considered before making up their minds." *Jordan v. United States Dep't of Justice,* 591 F.2d 753, 772–73 (D.C.Cir.1978) (en banc), *overruled in part on other grounds, Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051 (D.C.Cir.1981) (en banc).

 To invoke the privilege successfully, the government must show that, in "the context in which the materials are used," the documents are both predecisional and deliberative. *Wolfe v. Department of Health & Human Servs.,* 839 F.2d 768, 774 (D.C.Cir. 1988) (en banc). Predecisional documents are "prepared in order to assist an agency decisionmaker in arriving at his decision." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 184, 95 S.Ct. 1491, 1500, 44 L.Ed.2d 57 (1975). To satisfy this criterion, the government need not

> identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process ... the line between predecisional documents and postdecisional documents may not always be a bright one.

*NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 151–52 nn. 18–19, 95 S.Ct. 1504, 1516–17 nn. 18–19, 44 L.Ed.2d 29 (1975); *accord Access Reports,* 926 F.2d at 1196 (rejecting requirement that government "'pinpoint' a single decision to which the [withheld] memorandum contributed").

 Deliberative material "reflects the give-and-take of the consultative process," *Coastal States,* 617 F.2d at 866, by revealing the manner in which the agency evaluates possible alternative policies or outcomes. Thus, the deliberative process exemption protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.*

FOIA analysis does not end, however, with the determination that documents fall under a specified exemption. "The focus of the FOIA is information, not documents." *Mead Data Central, Inc. v. United States Dep't of Air Force,* 566 F.2d 242, 260 (D.C.Cir.1977). Thus, the statute requires that "[a]ny reasonably segregable portion of a record shall be provided ... after deletion of the portions which are exempt...." 5 U.S.C. § 552(b). For example, since "the prospect of disclosure is less likely to make an advisor omit or fudge raw facts" than opinions, *Quarles v. Department of Navy,* 893 F.2d 390, 392 (D.C.Cir.1990), purely factual material does not fall within the exemption unless it is "inextricably intertwined with policymaking processes" such that revelation of the factual material would simultaneously expose protected deliberation. *Mink,* 410 U.S. at 92, 93 S.Ct. at 838 (internal quotation marks and citation omitted).

 A similar analysis applies to draft material, which, particularly when presented by a subordinate to a superior for revision, is likely to receive deliberative process protection. *Providence Journal Co. v. United States Dep't of the Army,* 981 F.2d 552, 559 (1st Cir.1992). But the agency may waive that protection through voluntary, authorized release of the material to a nongovernmental recipient. *Florida House of Representatives v. United States Dep't of Commerce,* 961 F.2d 941, 946 (11th Cir.1992), *cert. dismissed,* — U.S. ——, 113 S.Ct. 446, 121 L.Ed.2d 363 (1992); *Coastal States,* 617 F.2d at 866 (exemption may be lost when material is formally or informally adopted as the agency's position or "used by the agency in its dealings with the public").

 Again, because serial *de novo* review of documents may not be "a wise use of increasingly burdened judicial resources," *Mead Data Central,* 566 F.2d at 262, the burden is on the agency to correlate, with reasonable specificity, materials within a document with applicable exemptions. Ideally, such specificity will render *de novo* review unnecessary. *Id.* at 260–62. Thus, trial courts must hold the government firmly to

that duty to enhance efficient decisionmaking, particularly when, after undertaking such time-consuming review, it appears that the government's claims of exemption are overly broad. *Cf. National Wildlife Fed'n v. United States Forest Service*, 861 F.2d 1114, 1116 (9th Cir.1988) (after *de novo* review by magistrate judge and district court under mandate from court of appeals, district court ordered agency to review documents anew in order to identify and release segregable material).

Here, upon examining the documents withheld by NMFS, the Magistrate Judge found the majority to satisfy the twin prongs of the deliberative process test. J.A. 260–64. The documents were construed as predecisional to, and deliberative of, the agency's forthcoming responses to (1) the City's July letter and (2) the pending FERC proceedings. *Id.* With respect to the documents now at issue, the Magistrate Judge found any factual material to be "inextricably intertwined" with deliberative material. J.A. 261. Of the draft documents, the Magistrate Judge examined closely only Document "A," finding that it had been adopted nearly verbatim in USFWS' final letter to the City. Accordingly, the Magistrate Judge recommended exempting only those portions of Document "A" that reveal discrepancies between the draft and final versions of the letter. J.A. 275 (citing *Coastal States*, 617 F.2d at 866).

Without discussing the status of Document "A," the district court rejected the recommendation that the remaining documents now at issue should be protected by the deliberative process privilege. The court found them to be postdecisional explanations, justifications, or descriptions of past agency action, and nondeliberative due to their essentially factual nature. 805 F.Supp. at 1330–34. The only exceptions were Documents 71 and 65, to the extent that they "addresse[d] NMFS's position in the pending FERC proceedings." *Id.* at 1328 n. 8, 1331 n. 14.[13]

 Those exceptions reveal several key errors in the district court's reasoning. We

reiterate that the first task in undertaking FOIA review is to identify the full context within which the contested documents are generated. *Wolfe*, 839 F.2d at 774. Only then can a court answer accurately the ultimate questions posed by the deliberative process privilege: whether the materials "bear on the formulation or exercise of agency policy-oriented *judgment* ... [and] whether disclosure would tend to diminish candor within an agency." *Petroleum Information Corp.*, 976 F.2d at 1435 (emphasis in original).

The district court's fundamental error was its failure fully to appreciate that the context here is framed not only by the completed Corps permit proceedings, to which the documents concededly look backward, but also by the pending FERC proceedings, to which NMFS was obligated by statute to contribute. Consequently, the documents appear as retrospective explanations of past events only when they are impermissibly abstracted from the context of NMFS' ongoing development of its position on the pipeline.

 Thus, the district court rightly held that materials relating to the pending FERC proceedings must be considered both "predecisional and deliberative." 805 F.Supp. at 1331 n. 14. But insofar as the court limited Exemption 5 to those documents that explicitly reference specific, pending proceedings—either in the Vaughn index or on their face—it fell afoul of *Sears'* ruling to the contrary, 421 U.S. at 151–52 nn. 18–19, 95 S.Ct. at 1516–17 nn. 18–19.

We believe that the district court was deflected from the proper mode of analysis by its concern to categorize the disputed papers in light of the *Mink* fact/opinion dichotomy. *See Petroleum Information Corp.*, 976 F.2d at 1435 (cautioning "against reflexive fact/opinion characterization as the way to decide ... Exemption 5 cases"); *National Wildlife Fed'n*, 861 F.2d at 1119 (inquiry must not become "semantics debate" that obscures Exemption 5 objectives). Evidence for this conclusion is the district court's

---

**13.** *See supra* n. 6 and accompanying text. With respect to Document 65, the court also found a portion exempt because it discussed the agency's

position on pending Superfund issues. *Id.* at 1331 n. 14. We affirm the district court's holding with regard to these documents.

heavy reliance upon *Playboy Enterprises, Inc. v. Department of Justice,* 677 F.2d 931 (D.C.Cir.1982).

In *Playboy,* the plaintiff sought disclosure of a report prepared for the Senate Judiciary Committee by a task force investigating allegations of possible agency misconduct. The Court of Appeals affirmed the district court's finding that the deliberative process privilege did not protect the purely factual recitation contained in the report. Specifically, the D.C. Circuit rejected the proposition that "the very narration of the facts" reflects the "choice, weighing and analysis" that is quintessential to the deliberative process. 677 F.2d at 935.

The government correctly argues that the instant case is distinguished from *Playboy* by a crucial factor: there, the agency identified no decision in relation to which the withheld investigative report could reasonably be construed as predecisional and deliberative. Instead, the government attempted unsuccessfully to locate the deliberative process within the report itself. *Id.* Of course, while the government need not anchor documents to a single, discrete decision amidst ongoing deliberative processes, *Sears,* an overly lax construction of the term "predecisional" submerges the rule of disclosure under the exemption. *Accord Assembly of California,* 968 F.2d at 921 ("Any memorandum always will be 'predecisional' if referenced to a decision that possibly may be made at some undisclosed time in the future."); *Coastal States,* 617 F.2d at 868 ("Characterizing these documents as 'predecisional' simply because they play into an ongoing audit process would be a serious warping of the meaning of the word.").

That risk is not present here. In addition to the contextual and documentary evidence supporting the Magistrate Judge's conclusion that the contested materials are predecisional and deliberative, the government also offered affirmative evidence in support of its motion for summary judgment. J.A. 79, 83–85 (Hall affidavit ¶¶ 3, 20, 22, 25) (describing documents as oriented toward NMFS' ongoing development of its position on the pipeline; specifically referencing FERC proceedings). Moreover, the City conceded at oral

argument before this court that it seeks the documents in order to undermine NMFS' position while the FERC decision is pending; it is reasonable to infer that NMFS would use them with an eye toward those proceedings as well. We believe that the Magistrate Judge correctly held the evidence to satisfy the government's burden of proof under the facts of this case.

We have considered the City's arguments to the contrary, and reject them. Specifically, we find the fact that the agency's investigations were responsive to the City's contentions regarding agency conduct during the completed Corps proceedings simply does not establish that the agency would not rely on them in the pending FERC proceedings. The City points out that the Southeastern Region did not obtain the Collins Report until after it submitted its comments to VEPCO for incorporation into its FERC application. But there is no basis for concluding that NMFS would or should have ceased to reassess its position during the eight months separating that submission and the final date for comment before FERC. *See* 56 Fed.Reg. 11991 (March 21, 1991) (final comments due in April, 1991).

Thus, bearing the documents' proper context in mind, "[w]e need not stretch our imaginations" to perceive that the purposes underlying the deliberative process exemption are directly implicated here. *Quarles,* 893 F.2d at 393. The City had challenged the substantive and procedural bases for the agency's stance on matters at issue in both past and pending proceedings—at the latter of which the agency had yet to fulfill its statutory duty to comment—alleging that agency personnel still involved in the decisionmaking process were tainting it through their serious misconduct and bias. The agency's ability to respond to those challenges with a thorough, carefully documented investigation and candid reassessment of its position might have been seriously impaired if it were required to do so "in a fishbowl." *Mink,* 410 U.S. at 87, 93 S.Ct. at 835.

Our analysis does not end, however, with the determination that, on the evidence before the district court, at the summary judgment hearing, the government carried its

burden of proving the contested documents to fall under the deliberative process umbrella of Exemption 5. Given the diametrically opposed constructions of the documents by the Magistrate Judge and the district court upon *in camera* review, prudence dictates that we assess independently whether the documents contain any "reasonably segregable" material. 5 U.S.C. § 552(b).

■ Our review satisfies us that, with respect to the documents in Category A, the district court correctly held their draft status to be an insufficient condition to merit their exemption, insofar as the agency has voluntarily released portions of those documents to the City. 805 F.Supp. at 1331; *accord Coastal States*, 617 F.2d at 866. The court failed, however, to examine the documents closely to prevent the City from "uncover[ing] any discrepancies between the draft[s]" and the final letters, which would reveal the agency's deliberations. *National Wildlife Fed'n*, 861 F.2d at 1122. The Magistrate Judge, conversely, performed that analysis correctly with respect to Document "A," J.A. 275–76, but failed similarly to assess the remaining documents in Category A.[14] We remand for the completion of that task, noting that the government is better situated than the judiciary to review the documents anew in order to identify and release any segregable material, and that the district court may, in its discretion, order the government to do so. *See National Wildlife Fed'n*, 861 F.2d at 1116.

Concerning the Collins Report and related documents, which the agency has consistently withheld in their entirety, we find that the factual and deliberative material are not "reasonably segregable." 5 U.S.C. § 552(b). Disclosure of much of the material "necessarily would reveal the opinion[s] of [agency personnel] on the credibility and probity of the evidence relating to each allegation" such that the revelation "would divulge the substance of [any] related recommendat[ions] with which [the factual findings] comport." *Providence Journal*, 981 F.2d at 562. More generally, by disclosing the direction of the agency's internal investigation and retrospective assessment, revelation would impermissibly encroach upon the decisionmaking process. Accordingly, we find those documents fully protected by the deliberative process exemption.[15]

For the foregoing reasons, the decision of the district court is affirmed in part, reversed in part, and remanded.

*SO ORDERED.*

---

**14.** The remaining draft materials are contained in Documents 19, 35, 36, 43, 44, 46, 61, 62, 68, and 70. The district court apparently inadvertently omitted Document 62 from its listing of Category A documents, to which it clearly belongs. *Compare* 805 F.Supp. at 1327 n. 5 *with id.* at 1329 n. 10.

As the Magistrate Judge did with Document "A," on remand these documents should be assessed for the reasonable segregability not only of published from nonfinal draft material, but also of factual from deliberative material. *Compare* J.A. 176.

**15.** Documents 10, 11, 17, 21 (page 2), 25 (¶ 2 on page 2) and its duplicate 27, 30, 33, 37, 39, 41, 42, 53–55, 58, 60, 67, and 73 (last line).